IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

KENNETH SCOTT RAULERSON,

      Plaintiff,

v.                            CASE NO. 1:08-cv-00222-MP-GRJ

DAVID ALRED, et al,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff brings this cause of action pursuant to 42 U.S.C. §1983 alleging that Defendants used excessive force against him during an arrest or failed to intervene as they observed excessive force being used against him. (Doc. 14). Defendants Blount, Alred and Dykstra have filed motions for summary judgment (Docs. 65 and 74) and Plaintiff has responded. (Docs. 67, 79, 81 and 82).

## I.    Allegations of the Second Amended Complaint (Doc. 14).

      Plaintiff contends that on June 1, 2006, Angela Doe[1] of the Palatka Police Department "lured" him, his son, and his son's mother to a house allegedly to do some tree work. The true purpose was to arrest him for a bank robbery that had occurred in 1998. Angela Doe allegedly held a gun on Plaintiff while he and his son were handcuffed. Once handcuffed, Plaintiff alleges that John Doe #1 held him in a choke

---

[1] Four "Doe" Defendants were partially identified in the original complaint, (doc. 1), but no identifying information was provided in the second amended complaint (doc. 14), which is the controlling pleading and the complaint that was served. (See Doc. 22). Thus, these defendants have never been served. Although Plaintiff was advised that he should identify the Doe Defendants during discovery, (doc. 20), he did not do so prior to the close of discovery on September 3, 2009. (See Doc. 40).

hold while Defendant Baily[2] ordered his attack dog, Saber, to attack Plaintiff in the stomach while Defendants Blount, Alred, Merchant, Dykstra, and two other John Doe defendants held him at gun point and watched the attack. Plaintiff claims the attack caused great pain, severe lacerations and permanent scarring of his lower abdomen. He seeks $200,000 from each defendant, payment of his hospital bill and the bill for his son. Plaintiff also requests that the Court order Defendant Baily to resign.

A)    <u>Affidavit of Carla Chaffin</u>

Ms. Chaffin attests that she drove Plaintiff and their son to meet with a woman in Francis, Florida, to give an estimate on a tree job. When they arrived the woman asked if they would come in and move some things, but once they were inside, officers came out from another door with their laser beam guns drawn. Plaintiff surrendered and was handcuffed. Ms. Chaffin and her son went to the ground as they were told, and she heard Plaintiff yelling to get the dog off of him. She heard an officer yell, "He made contact," and then she heard them beating Plaintiff. Her son was pulled violently from the room and her arm was jacked up behind her back as she was led out of the house.

B)    <u>Affidavit of Justin Raulerson</u>

Mr. Raulerson attests that he came with his mother and father to the house in Francis, Florida, to give an estimate on some tree work. When the officers rushed in with the dog, Mr. Raulerson states he was bitten immediately, and it was not until his father was restrained that they pulled the dog off him and directed the dog to attack his

---

[2] This Defendant's last name has been spelled as "Baily" and "Bailey" and will be spelled both ways throughout the report as it is spelled in the documents being referenced.

father repeatedly as he sat in handcuffs on the floor. The attack lasted 30 to 45 seconds, then Mr. Raulerson was dragged by his ankles out of the house and onto the lawn. His father was also removed from the house and placed on the ground beside him bleeding from the stomach.

C)    Letters

Plaintiff has attached copies of letters to all the law enforcement agencies involved, as well as the State Attorneys Office, the Governor's Office, and the United States Department of Justice telling them what happened and asking for reports or that charges be brought. The responses to the letters advised that there was no report made of the incident, and that Plaintiff should send more information before the Attorney's office or the Department of Justice could take action. Plaintiff advises in his letters that he has medical records and pictures of the injuries.

**II.    Standard of Review**

A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." Nolen v. Boca Raton Community Hospital, Inc., 373 F.3d 1151, 1154 (11th Cir. 2004), *citing* Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986). All issues of material fact should be resolved in favor of the Plaintiff or non-moving party before the Court determines the legal question of whether the defendant is entitled to judgment as a matter of law under that version of the facts. Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002). The Plaintiff has the burden to come forward with evidentiary material demonstrating a genuine issue of fact for trial. Celotex, 477 U.S. at

322-23.  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, <u>Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  "For factual issues to be considered genuine, they must have a real basis in the record." <u>Mize v. Jefferson City Board of Education</u>, 93 F.3d 739, 742 (11th Cir. 1996).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

While a moving party is not required to support his motion for summary judgment with affidavits, <u>Celotex</u>, <u>supra</u> at 323, the facts stated in uncontradicted affidavits or other evidentiary materials must be accepted as true for purposes of summary judgment.  <u>Gauck v. Meleski</u>, 346 F.2d 433, 436 (5th Cir. 1965).

### III.    Defendants' Rule 56 (e) Relevant Evidence

a)    <u>Deposition of Plaintiff (doc. 66)</u>

Plaintiff is presently serving a ten year sentence for bank robbery (Exhibit A at 7) with a release date of December 15, 2015.  (Exhibit A at  4).  He has two prior convictions for armed robbery in 1989 and for  "a barroom fight" in 1986.  (Exhibit A at 9).  Plaintiff describes his injury as a burning in his stomach when he does sit ups, from the "muscle tear" or "something ain't healed properly all the way or I keep tearing it." Plaintiff  has not sought any treatment for the injury, has not complained about it to any medical personnel,  nor have the alleged injuries interfered with his work abilities. (Exhibit A at 16 - 17).  He currently takes no medication, except for high cholesterol. (Exhibit A at 17).  The scar that remains is "a perfect dog mouth going right across my belly," with indentations of the front four teeth and three or four of the back teeth. (Exhibit A at 19).  He also has scars on his left and back shoulder.  (Exhibit A at 20). The scar on his stomach is three or four inches long, below his navel  about an 1/8 of an inch or less, and the scar on his shoulder is about two inches long. (Exhibit A at 21). Defendant Blount took pictures of the wounds at the site, and an inspector came to the Suwannee County Jail and took more.  (Exhibit A at 21-22).  The only treatment Plaintiff received was a Tetanus shot. He did not receive stitches, although he claims he should have because it was  "a pretty ugly wound."  (Exhibit A at 24).  No doctor ever examined Plaintiff, and no follow up treatment or additional wound dressing was provided at the jail.  (Exhibit A at 28-29).  Plaintiff's son received a bill from the hospital for over $300.00, but Plaintiff never received a bill, although he asked for one, and has paid nothing towards the hospital costs.  (Exhibit A at 31).  Plaintiff's only expenses resulting

from the incident have been related to this lawsuit for filing fees and copies.  (Exhibit A at  31).

Regarding the incident, Plaintiff stated that he immediately threw his hands up, sat down and was handcuffed, as soon as he heard all the commotion in the house (Exhibit B at 65).  Plaintiff was in a choke hold with a gun pointed at his head when he saw Defendant Bailey take the dog off his son and walk the dog around to Plaintiff's front.  (Exhibit B at 65-66).  The dog bit Officer Bailey on the arm.  (Exhibit B at 65).  Bailey then slapped Plaintiff's stomach and told the dog in German to attack him.  (Exhibit B at 66).  The dog grabbed his belly, got a good hold of him and started shaking.  (Exhibit B at 66).  When the dog would not release, Defendant Baily "snatched him" causing a tear across Plaintiff's stomach.  (Exhibit B at 67).  Plaintiff denies resisting arrest in any way.  (Exhibit B at 69).

There were five to eight law enforcement officers in the room during the attack.  (Exhibit B at 71).  Plaintiff cannot recall Dykstra being there, but an unidentified friend told Plaintiff later that she overheard Dykstra talking about the incident when she was in jail.  (Exhibit B at 71).  Plaintiff knows Defendant Merchant was there because it said so in the police report.  (Exhibit B at 73).  Plaintiff testified that he was also present for a conversation between Merchant and another K-9 officer when they commented on how "wrong" the dog attack was.  (Exhibit B at 84).  Defendant Blount identified himself as the one in charge and the two of them had a conversation at the scene.  (Exhibit B at 75).  Defendant Alred was in the room, and may have used a gun, because this was mentioned in the police report.  (Exhibit B at 76).  After Baily took the dog off of Plaintiff, Plaintiff's feet were tied up with the dog leash, and he was led out the door.  (Exhibit B

at 77).  Plaintiff could still walk in "baby steps."  (Exhibit B at 77).  He was placed face

down outside on the grass, but was rolled over and Defendant Blount took pictures of

his wounds with his phone.  (Exhibit B at 81).  Plaintiff went to the hospital in the

Sheriff's car where he was treated for 20 to 30 minutes.  (Exhibit B at  82).

     B)     <u>Newspaper Article "It's Time to Die." (Exhibit B)</u>

Raulerson is quoted as saying he would make his "last stand" in the woods

where he grew up, and that he "has declared WAR on law enforcement," "welding some

firepower, he awaits law enforcement retrieval..." warning that he will "not be taken

alive, he will not serve one day behind bars."

     C)     <u>United States Marshals Service Report (Exhibit C)</u>

The report discloses that Raulerson was arrested for "kidnapping (1);

assault/battery (4); burglary (7); weapons (4); robbery (3); narcotics (2) and extortion

(1)."  Plaintiff was considered armed and dangerous, with violent tendencies, known to

abuse drugs, and an escape risk.  He had an arrest and a conviction for aggravated

battery on a law enforcement officer and his profile was "[c]areer criminal, serial armed

robber, and armed and dangerous."

     D)     <u>FDLE Investigative Report</u>

On October 14, 2000, Raulerson was featured on America's Most Wanted

resulting in several phone calls to the studio which were directed to FDLE Special

Agent Bill Gootee.  Witnesses had sighted Raulerson in the Citrus County area.

Another witness related that they thought Raulerson lived behind a Chevron service

station in Inglis, Florida, and was armed.  This information was not considered reliable

by the Inglis Police Department.  Another person saw Raulerson at an auto parts store

in Ocala. All of these leads went nowhere.

On February 13, 2003, an email was forwarded to Mr. Gootee from America's Most Wanted that contained information about Plaintiff. It said that Plaintiff had been "robbing" since he was let out of prison, but had also worked on fishing boats in Canada. The email recited that Plaintiff had returned to Florida about a year before and was living at a campsite in the woods, but he may have returned to Canada. The email also described Plaintiff as saying he would rather die than go back to prison.

On October 31, 2003, Agent Gootee received a fax from America's Most Wanted with an address and phone number of Plaintiff's father and a warning that Plaintiff was always armed and would shoot to kill.

     E)    <u>Affidavit of Duane Dykstra (doc. 75)</u>

Defendant Dykstra is a Deputy Sheriff with Levy County, who was familiar with Raulerson and was asked by the United States Marshals Service to identify Raulerson in connection with his apprehension on June 1, 2006. Dykstra was also familiar with Raulerson's criminal history and with threats he had made towards anyone attempting to capture him. Dykstra traveled to Putnam County and went with the marshals to a home where Raulerson was expected to be arrested, but he arrived after Raulerson was already cuffed. Dykstra did not witness the actual arrest, was not present when the dog allegedly bit Plaintiff, did not observe the wounds allegedly made by the dog and had no responsibilities or authority in connection with the K-9 unit.

     F)    <u>Deposition Excerpts from Raulerson concerning Dykstra (doc. 75)</u>

During his deposition Raulerson provided the following testimony:

Q. Where's Dykstra?

A.  I don't know where he's at in relation to – you know, because there was several – you know, there's five, six, seven, maybe eight cops in the room and they're all screaming and yelling with guns.  I'm not looking at faces, I'm looking at my family, my son.  I'm keeping my eye on my son.

Q.  So you can't say whether Dykstra was in the room and saw any of this or whether he was outside?

A.  No, sir, I can't.  I can't rightly say.

Q.  Okay.  How is it that you know Dykstra was even there?

A.  I've got it in the–actually, he went back–he's gonna love this.  He went back to the hometown in Bronson there and he made a comment to somebody that, man, they put that dog on him, I can't believe they put that dog on him.  So that's how I knew he was there.

Q.  Who did he say that to?

A.  I don't even know who he said it to, but it got back to me somehow.

Q.  Who did it get back to you from?

A.  I don't know.  I don't know who it was that told me this, but someone had – oh, Lynn Lashbrook is the one that told me that.

***

A.  She's a girl I was messing with, and she – she at the time was hooked on crack and that's why I never – I stopped messing with her.  But she's the one that told me that Duane Dykstra was there.  And how she found this out, I don't know.

***

A.  And she was saying that – I think she heard it – she went to jail or something

around that period of time and she was saying that – how Dykstra was saying that he

told the sheriff or something that the arrest went smooth and they put the dog on me

and they shouldn't have done it.

Q. But you can't describe Mr. Dykstra for me if he walked the room today?

A. Couldn't tell you.

## IV.    Plaintiff's Responses (doc. 67, 81, 82)[3]

A)    Bailey's Report (doc. 81, exhibit A)

The description of the incident is as follows:

Once inside the residence the take down would be executed in which the
K-9 would be released for apprehension while purpose and authority was
being announced.  At approximately 12:30 p.m. the suspect arrived.
Writer along with assisting deputies were positioned behind closed doors
when suspect entered the designated area to be taken down.  Once
inside the signal was given and the take down executed.  When I exited
my secure area to enter the living room area where the suspect was I
observed the son of the wanted person Kenneth Scott, Justin David
Raulerson along with an unknown W/F standing in the door way.  At this
point marshalls [sic] exited and suspect was given verbal commands
purpose and authority.  K-9 Saber was deployed on lead with writer at K-9
right side.  As writer enter into the door way Justin Raulerson fell to the
floor as writer and K-9 were attempting to get by.  K-9 Saber already been
given the command to attack grabbed suspect Justin Raulerson at the left
side back area as he was going down.  K-9 then let go and continued
toward Kenneth Scott who at this time was moving toward writer and K-9
from the east side of the room.  K-9 Saber struck said suspect K
Raulerson in the stomach/adommon [sic] area.  Kenneth S. Raulerson
was secured in cuffs by assisting marshalls [sic] and the K-9 released.

Conclusion: Said suspects K. Raulerson and was taken into custody on
warrants ranging from several counts of armed robbery, kidnapping, false
imprisonment, various felony narcotic's violations, grand larceny etc.
Justin Raulerson was arrested V.O.P. violations.  Both suspects were

---

[3]  Some of the materials included in Plaintiff's response are duplicative of
Defendants' materials which are summarized above or were included with Plaintiff's
amended complaint and summarized above.

treated on scene by a U.S. Marshal medic for injuries received from K-9 apprehension. They were then taken to Putnam Community Medical Center where they were treated and released for the same. They were then delivered to the Putnam County Jail where Kenneth S. Raulerson will be held without bond. Use of force report will be submitted.

B)   Affidavit of Justin Raulerson (exhibit B)

Justin Raulerson attests that he was with his father and mother on June 1, 2006, at approximately 12:30 p.m. at 158 Motes Rd in Francis, Florida, in a small room when 7 to 10 officers entered yelling at them to get down. He heard his father identify himself as the one they wanted and he was immediately handcuffed and held in a choke hold by an officer. There were red laser dots from other guns fixed on his chest. The dog bit Jason on the side as he was laying down. The officer in charge said "That's not him. He's over there." The K-9 deputy removed the dog from Jason and took him to where Kenneth Raulerson was and Jason saw the dog bite the officer who was holding Kenneth Raulerson. The officer yelled to "get the dog off" and the K-9 deputy slapped Kenneth on the stomach and commanded the dog in German to attack. The dog mauled Kenneth until he asked the officer "how long he was going to let his dog eat him."

C)   Pictures (exhibit C)

The pictures show scratch marks and abrasions on the shoulder and scrapes and puncture wounds on Plaintiff's abdomen.

D)   Use of Force Report (exhibit D)

The report identifies A.P. Bailey as the officer using force. He lists reasons as psychological intimidation, verbal threats, and defensive resistance by "moving toward officer and K-9." He also explains that the suspect was believed to be armed and had

an extensive violent history and "stated he would kill LEO or K-9 on contact." The suspect was injured, treated at Putnam Community Medical by an ER physician, and released.  The wounds were described as "puncture wounds to the stomach from K-9 bite."  The use of force was deemed justified.

      E)      <u>Interrogatory responses by Duane Dykstra (exhibit E)</u>

Dykstra states he was called in to identify Raulerson, but did not prepare a report because he did not actually arrest him and did not know he had been taken to the hospital.

      F)      <u>Answer and Affirmative Defenses of Defendant Bailey (Doc. 82, Exhibit D)</u>

Bailey admits that "during the course of the arrest of the Plaintiff, his K-9 dog was deployed as Plaintiff, known to be a violent person who had made threats to do physical harm to law enforcement officers, began to move toward this Defendant and his K-9 dog, despite being instructed to the contrary."  Bailey also admits that "during the course of the apprehension of the Plaintiff, Plaintiff was bitten by Defendant's K-9 dog in the stomach and abdomen area, for which he subsequently received medical treatment."

**V.**    **Analysis**

      a)      <u>Excessive Force and Failure to Protect</u>

A claim of excessive force in the course of an arrest, investigatory stop, or any other "seizure" of a free citizen is analyzed under the Fourth Amendment and its "reasonableness" standard.  <u>Graham v. Connor</u>,  490 U.S. 386 (1989); <u>Hamm v. Powell</u>, 874 F.2d 766 (11th Cir. 1989), as modified on rehearing, 893 F.2d 293 (1989). The issue of "reasonableness" requires "careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue,

whether the suspect poses an immediate theat to the safety of the officers or others,

and whether he is actively resisting arrest or attempting to evade arrest by flight."

Graham v. Connor, 490 U.S. at 396.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d [1028], at 1033 [(2d Cir.), *cert. denied*, 414 U.S. 1033 (1973)], violates the Fourth Amendment  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

Id.

Applying these factors to the present case, the first factor –  the severity of the

crime at issue –  weighs heavily against Plaintiff.  Plaintiff was wanted for armed

robbery of a bank, kidnapping, burglary while armed, and possession of a destructive

device.  His criminal history included a conviction for robbery with a deadly weapon and

aggravated assault with a weapon, including aggravated battery on a law enforcement

officer, which Plaintiff disputes.  Even assuming Plaintiff had not assaulted a law

enforcement officer, the other crimes Plaintiff does not contest are severe, violent, and

involve the use of deadly weapons.

The second factor, as well, weighs heavily against Plaintiff. Under the second

factor the Court looks to whether the defendant posed an immediate threat to the safety of the officers or others. The reports, which were circulating among the law enforcement agencies, as well as information provided by recent callers responding to an episode on American's Most Wanted, described Plaintiff as armed and dangerous. Although Plaintiff disputes the accuracy of the newspaper article where he is quoted as saying he would not be taken alive and that he had weapons he would use to evade capture, the accuracy of the article makes little difference. Thus, even though Plaintiff claims he said none of the things repeated in the newspaper article, the article was printed and available to the officers and, whether true or not, supported their perception of Plaintiff as a substantial and immediate harm.

With regard to the third factor – i.e. whether Plaintiff was actively resisting arrest or attempting to evade arrest when the force was used – there is a material genuine factual dispute sufficient to preclude summary judgment.[4]

Plaintiff contends that he was in a choke-hold with numerous laser guns aimed at him, handcuffed, and in full compliance with the commands to "get down" when Bailey directed the dog to attack him by patting Plaintiff's stomach and giving a command in German. According to Plaintiff, the dog grabbed his stomach and shook him for 30 to 45 seconds before Bailey pulled him off raking his teeth across the stomach as he did. The pictures provided by Plaintiff reflect injuries entirely consistent

---

[4] It is worth noting at this point that only Defendant Dykstra submitted an affidavit detailing his involvement in and recollection of the events at issue. Neither Defendant Blount nor Alred have submitted their sworn version of the incident and while they make certain arguments in their memorandum, argument is not Rule 56(e) evidence sufficient to contravene the sworn affidavits submitted to support Plaintiff's version of the facts.

with this description.  (Doc.81, Exhibits C1 and C2).

The facts, as recited in Bailey's use of force report and in his answer to the complaint,[5] are that the dog had been commanded to attack before they entered the room, and he struck Plaintiff in the stomach when Plaintiff continued "moving towards" Bailey and the dog after being told to get down.  As reasons for the use of force Bailey also reported that Plaintiff made verbal threats and used psychological intimidation. There is, however, no record evidence describing what the threats were or how the intimidation was achieved.  According to the report, the dog ceased the attack as soon as Plaintiff was secured in handcuffs.  These facts are not presented in a sworn affidavit from Bailey, who has not filed a motion for summary judgment.  Notably, neither Blount nor Alred have submitted affidavits describing the incident in support of their motion.  Plaintiff, on the other hand, has provided several sworn affidavits from witnesses supporting his version of the incident. Further, Plaintiff testified under oath at his deposition that he was fully restrained and in handcuffs when Bailey ordered the attack.

When deciding a motion for summary judgment the Court is required to resolve issues of material fact in favor of the non-moving party,  Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002), and while a moving party is not required to support his motion for summary judgment with affidavits, Celotex, supra at 323, the facts offered in uncontradicted affidavits or other evidentiary materials must be accepted as true for purposes of summary

---

[5]  These materials were included in Plaintiff's response.  (See Doc. 81, Exhibit A).

judgment.  Gauck v. Meleski, 346 F.2d 433, 436 (5th Cir. 1965).

Therefore, accepting Plaintiff's version that he was not resisting arrest when the dog was commanded to attack him, would be sufficient to constitute  excessive force. Hadley v. Gutierrez, 526 F.3d 1324 (11th Cir. 2008); Lee v. Ferraro, 284 F.3d 1188 (11th Cir. 2002) (driver arrested for honking horn in traffic had face slammed into car); Slicker v. Jackson, 215 F.3d 1225 (11th Cir. 2000) (arrestee cuffed when officer slammed his head into pavement and kicked him); Smith v. Mattox, 127 F.3d 1416 (11th Cir.1997)(officer broke arrestee's arm after he was down on ground).

Defendants reliance upon  Crenshaw v. Lister, 556 F.3d 1283 (11th Cir. 2009) does not change the result. Crenshaw stands for the proposition that  that the use of a dog during an arrest may be objectively reasonable – even if the attack results in severe injuries – so long as the use of a  canine under the circumstances was objectively reasonable. While the Plaintiff here may have been a dangerous suspect like the suspect in Crenshaw the dog attack in Crenshaw ceased when the suspect was handcuffed and subdued.  In contrast, Plaintiff's version of the incident is that the dog was commanded to attack Plaintiff *after* he had been handcuffed and subdued.

Defendants also argue that Plaintiff's claim fails because his injuries were *de minimis*.  While the Eleventh Circuit has held that a *de minimis* use of force, without more, will not support a claim of excessive force under the Fourth Amendment,  Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000), the issue of whether Plaintiff's injuries were indeed *de minimis* is less than clear on this record.  On the one hand, Plaintiff did not receive stitches, did not see a doctor at the hospital, and was treated at the ER for about 20 minutes while his wounds were cleaned and dressed. Further, the record

suggests that no follow up treatment was recommended, given or sought by Plaintiff nor were there any medical expenses incurred by Plaintiff. Nonetheless, Plaintiff complains that he continues to experience pain when exercising, which he characterizes as continuing "muscle tears." While Plaintiff's injuries are certainly less severe than those described in Crenshaw, where the suspect received 31 bite marks, or those described in Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000), where the arrestee received 14 puncture wounds on his legs, Plaintiff, nonetheless, produced evidence of bite marks from the dog attack and resulting treatment at the emergency room.  The evidence that Plaintiff's damages might not be severe is different from the issue of whether the use of force was *de minimis*. Although Plaintiff may only be able to establish nominal damages, *see,* Slicker, supra at 1231-1232, whether or not Plaintiff ultimately can prove damages does not mean that his claim is subject to dismissal on summary judgment.

Finally, while Bailey may have used excessive force, Defendants Blount and Alred point out that Plaintiff has not alleged that either of them had any contact with Plaintiff or used any force – excessive or otherwise –  against him.  The only allegation against Blount and Alred is that they were in the room with their guns fixed upon him. Accordingly, to the extent Plaintiff is attempting to assert claims of excessive force against Blount and Alred these claims are due to be  dismissed.

     b)     Failure to Protect

With regard to Defendants Blount and Alred, Plaintiff also alleges that they are liable because they were present when the dog attack occurred but failed to intervene.

An officer who witnesses the use of excessive force and fails to intervene can be

liable for this failure.  <u>Hadley</u>, supra at 1331.  To establish liability the plaintiff must

demonstrate that the non-intervening officer was actually in a position to intervene and

failed to do so.  <u>Id.</u>, at 1320.  In <u>Hadley</u> the witnessing officer was not held liable for

failing to intervene because there was no evidence presented that he could have

anticipated the use of force by his partner in time to prevent the blow (one punch in the

stomach) to the victim.

Defendants Blount and Alred contend that they were not in a position to

intervene because they were not responsible for the dog and could not control it.  (<u>See</u>

Doc. 65, p. 5).  They also argue that because the attack lasted less than a minute it is

unreasonable to suggest that they could recognize that excessive force was being used

in time to do something to stop it given the "fluid" circumstances of the arrest.  (Doc. 65,

p. 10).  The record does reflect a scenario where there was considerable confusion,

with several officers yelling at once, and a dog biting Plaintiff's son and another officer

in the melee.

"The calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments--in circumstances that are

tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a

particular situation." <u>Graham</u>, 109 S.Ct. at 1872.  Nonetheless, the facts offered by

Plaintiff and his witnesses, uncontroverted by any evidence from Blount or Alred,

suggest that Blount and Alred were in the room when Plaintiff was cuffed and compliant

and that Blount and Alred watched as Bailey directed the dog to attack Plaintiff in the

stomach.  Whether the abbreviated time frame was too short for Blount and Alred to

intervene and whether the fact they were not dog handlers is a reason they could not

intervene to stop the dog attack are questions best left for resolution by the trier of fact and not appropriate determinations to be made on summary judgment on this record.

With regard to Dykstra, he has submitted a sworn affidavit attesting that he was not even in the area of the house when the dog bite occurred and he arrived on the scene to identify Plaintiff after the incident was over and Plaintiff had been handcuffed. Plaintiff admits that he did not see Dykstra there and only named Dykstra because someone said she overheard Dykstra talking about the incident at the jail. Notably, none of Plaintiff's witnesses mention Dykstra in their affidavits. Even taking Plaintiff's version of the "facts" as true, i.e. that someone overheard Dykstra telling the sheriff "that the arrest went smooth" and "they" put the dog on him does not place Dykstra either at the scene when the dog attack occurred or in a position to intervene. Accordingly, the claims against Dykstra for failing to intervene are due to be dismissed.

    c)    <u>Qualified Immunity</u>

Qualified immunity protects a government official who was performing discretionary functions from liability and other burdens of litigation. <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001). It operates to shield defendants from liability for damages if their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity protects officials from the sometimes hazy border between constitutional and unconstitutional actions. <u>Saucier</u>, supra at 206. The Supreme Court in <u>Saucier</u> recognized that:

It is sometimes difficult for an officer to determine how the relevant legal

doctrine [] will apply to the factual situation the officer confronts.  An
officer might correctly perceive all of the relevant facts but have a
mistaken understanding as to whether a particular [action] is legal in those
circumstances.  If the officer's mistake as to what the law requires is
reasonable, however, the officer is entitled to the immunity defense.

Saucier, supra at 205.

There is a two part test for determining whether qualified immunity applies: (1)

whether the plaintiff has alleged the deprivation of an actual constitutional right; and (2)

whether the right was clearly established at the time of the alleged violation.  Id., at 201.

Federal courts are not required to conduct this analysis in any particular order, but may,

in their discretion and in light of the specific context of the case, decide which prong of

the inquiry to address first.  Pearson v. Callahan, 555 U.S. ___, 129 S.Ct. 808 (2009).

The Court is required to take the facts in the light most favorable to the Plaintiff in

assessing whether the officer's conduct violated a constitutional right.  Saucier, supra at

201; Skrtich v. Thornton, 280 F.3d 1295, 1306 (11th Cir. 2002).

In assessing the second prong of the test, the Supreme Court has held that

qualified immunity does not require that there be materially similar cases, only that the

unlawfulness of an act or omission be apparent in light of pre-existing law.  Hope,

supra.

The Eleventh Circuit has held that the critical inquiry in determining whether law

is "clearly established" is whether the defendants had "fair warning" that their conduct

was unlawful. Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002). The Vinyard

court explained that "fair and clear notice" can be given in several ways. First, a federal

statute or constitutional provision may be so clear, and the challenged conduct so bad,

that case law is unnecessary to put someone on notice that the conduct is unlawful. Id.

Second, case law announcing general principles of law that are not tied to particularized

facts may provide sufficient notice that certain conduct under a different set of facts is

illegal. Id. at 1351.  Last, in some circumstances, a very high degree of prior factual

particularity may be necessary to provide sufficient warning that certain conduct is

unlawful. Id. at 1351-52.

Again, accepting Plaintiff's version of the facts as true for purposes of assessing

the availability of qualified immunity, the Court concludes that Defendants would be on

fair and clear notice that allowing a handcuffed and subdued suspect to be bitten by a

dog during an arrest would be unlawful. As such, Defendants would not be entitled to

qualified immunity. When the "conduct lies so obviously at the very core of what the

Fourth Amendment prohibits that the unlawfulness of the conduct was readily

apparent," the law is clearly established.  Priester v. City of Riviera Beach, 208 F.3d

919, 926 (11th Cir. 2000), quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th

Cir.1997)). Under this test, the law is clearly established and qualified immunity is

overcome based upon the  reasonableness factors set forth in Graham.  See Priester,

supra at 926-27 (denying qualified immunity to police officer who allowed police dog to

attack arrestee who was already subdued and lying on the ground).  Accordingly, the

Defendants are not entitled to qualified immunity.

In light of the foregoing, it is respectfully **RECOMMENDED**:

(1) The motion for summary judgment filed by Defendants Blount and Alred (doc.

65) should be **GRANTED in part and DENIED in part**. The motion for summary

judgment should be **GRANTED** with regard to Plaintiff's claims of excessive force

against Blount and Alred but should be **DENIED** with regard to Plaintiff's claim that

Blount and Alred failed to intervene and protect Plaintiff from the use of force.

(2) The motion for summary judgment filed by Defendant Dykstra (doc. 74)

should be **GRANTED** and the claims against him should be **DISMISSED**.

At Gainesville, Florida, this 18ᵗʰ day of November, 2010.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**